# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

UNITED STATES OF AMERICA,     )
                                     )
        Plaintiff,           )         NO. 3:10-cr-00260
                                     )         JUDGE HAYNES
v.                           )
                                     )
ABDULLAHI SADE AFYARE,      )
                                     )
        Defendant.     )

## M E M O R A N D U M

The United States filed this action against twenty nine defendants, including the

Defendant Abdullahi Sade Afyare. In the November 3, 2010 Superseding Indictment, the Grand

Jury charged Abdullahi Sade Afyare as follows:

> Count One - conspiracy to violate 18 U.S.C. § 1591(a)(1) in violation of 18
> U.S.C. § 1594(c); for conspiracy to recruits, entices, harbors, transports, provided,
> obtains or maintains anyone under the age of 14 and under the age of 18 in
> violation of 18/1951(a)(1);
>
> Count Two - conspiracy to violate 18 U.S.C. § 1591(a)(2) in violation of 18
> U.S.C. § 1594(c) for conspiracy to benefit financially or by receiving anything of
> value, from participating in a venture which recruits, entices, harbors, transports,
> provides, obtains or maintains anyone under the age of 14 and under the age of 18
> in violation of 18/1951(a)(2);
>
> Count Three - obstruction of justice in violation of 18 U.S.C. § 1512(k) for
> conspiracy to knowingly corruptly persuade another person, or attempt to do so,
> to alter, destroy, mutilate, or conceal an object with the intent to impair to object's
> integrity and availability for sue in an official proceeding and with intent to
> hinder, delay and prevent the communication to a law enforcement officer of
> information relating to the commission or possible commission of the Federal
> Offense;
>
> Count Four - obstruction of justice in violation of 18 U.S.C. § 1591(d) for
> knowingly did attempt to obstruct, and in any way interfere with and prevent the
> enforcement of Title 18 U.S.C. § 1591(a);

1

Court Twelve - conspiracy to violate 18 U.S.C. 1594(c) (2) in violation of 18 U.S.C. § 1594(c) for knowingly recruit, entice, harbor, transport, providing, obtain or maintaining anyone under the age of 14 and under the age of 18 in violation of 18/1951(a)(1);

Count Thirteen - conspiracy to violate 18 U.S.C. 1594(a)(2) in violation of 18 U.S.C. § 1594(a) for attempt to knowingly recruit, entice, harbor, transport, provide and obtain by any means, a minor under the age of 14, namely, Jane Doe Two, knowing that Jane Doe Two had not attained the age of 18 years and knowing that Jane Doe Two would be caused to engage in a commercial sex act in violation of Title 18, United States Code, Section 1591(a).

Count Eighteen - conspiracy to produce, use or traffic in one or more counterfeit access devices in violation of 18 U.S.C. 1029(a)(1), 1029(a)(2), and 1029(a)(3) in violation of 18 U.S.C. 1029(b)(2) for conspiracy to knowingly and with intent to defraud produce, use, and traffic in one or more counterfeit access devices and to knowingly and with intent to defraud traffic in and use one or more unauthorized access devices during any one-year period, and by such conduct obtain anything of value aggregating $1,000 or more during that period, and to knowingly and with intent to defraud possess fifteen or more devices which are counterfeit or unauthorized access devices; and

(Docket Entry No. 36, Superseding Indictment).

The specific factual allegations on these charges are discussed infra. The maximum possible penalty for Counts One, Two, Twelve and Thirteen is life imprisonment, for Counts Three and Four is twenty years imprisonment, and for Count Eighteen is fifteen years imprisonment.

On November 8, 2010, Defendant Abdullahi Afyare was arrested in Minnesota and the United States filed a motion to detain him. (Docket Entry No. 70). After a detention hearing, the Honorable Franklin L. Noel, Magistrate Judge for the District of Minnesota, found that this Defendant should be released on certain conditions.[1] The Government appealed that decision and

---

[1] In the Defendant's Minnesota detention proceedings, the government did not offer any proof. (Docket Entry No. 342-1 at 19). Judge Noel explained (involving another co-defendant): "...what I'm supposed to look at is the weight of the evidence against the defendant, and just by its very nature an indictment doesn't have any. In other words, it's an indictment, it's simply a charging document, it makes allegations, it asserts things and there's nothing in the indictment that gives me any hint as to what the weight of the evidence is. In other words, how strong is the Government's case. Is there anything you can point to or is there anything you can tell me that's in the record that would give me some indication of how strong the Government's evidence is as to this defendant?

2

sought of stay of the release order.  (Docket Entry No. 187).  Given the nature of the charges, the Court stayed the Magistrate Judge's release Order of this Defendant pending a hearing on the Government's appeal.  (Docket Entry No. 189).

The Government's motion for detention relies upon 18 U.S.C. § 3142(f)(2)(A) and (B) to assert: (1) that if released, there is a serious risk that this Defendant will obstruct justice or attempt to obstruct justice based upon the charges against him; (2) that this Defendant is a serious flight risk; and (3) that there are not any conditions to justify Defendant's pretrial release.

At the detention hearing for Defendant Abdullahi Afyare, the Government did not present any additional evidence in support of the allegations of the Superseding Indictment, but did present other exhibits and called several witnesses.  The Defendant also called several witnesses. After the hearing, the parties submitted proposed findings of fact and conclusions of law. (Docket Entry Nos. 553 and 554).

### A. Review of the Superseding Indictment

The Superseding Indictment charges, <u>inter alia</u> multiple conspiracies arising out of a "Venture" under 18 U.S.C. § 1591(E)(5) involving several groups: the Somali Outlaws ("SOL"); the Somali Mafia ("SM") and the Lady Outlaws, gangs that originate in Minneapolis, Minnesota. These gangs identify, recruit and obtain females under the age of 14 years and under the age of 18 years to participate in commercial sex acts in exchange for money and other items of value in violation of as 18 U.S.C. § 1591(e)(3). The members of this venture operated in Nashville, Tennessee, Saint Paul and Minneapolis, Minnesota and Columbus, Ohio. (Docket Entry No. 36, Superseding Indictment at 4-6).

---

MR. STEINKAMP: No, Your Honor, I'm not - - I'm not prepared to offer evidence on the charges." (November 10, 2010 Removal and Detention Hearing as to Andrew Kayachith, Transcript at 7-8).  Judge Bryant, a Magistrate Judge also denied the United States' motion for detention for other co-defendants where the Government did not submit proof on its detention motion.

As to his specific overt acts, in Count One, the Government alleges Defendant Abdullahi Afyare accompanied other Defendants in transporting Jane Doe Two from her high school to a residence where Defendant Abdullahi Afyare engaged in a sex act with Jane Doe Two. Id. at ¶¶ 30-31. Defendant Abdullahi Afyare later accompanied other Defendants to a hotel room where certain other Defendants, but not Defendant Abdullahi Afyare, engaged in a sex act with Jane Doe Two. Id. at ¶¶ 32-36. Count One further alleges that on or about April 26, 2009, Defendant Abdullahi Afyare and other Defendants drove Jane Doe Two to a location in Minneapolis, Minnesota for purposes of engaging in a sex act in exchange for money. Id. at ¶¶ 42-44. Later that day, Defendant Abdullahi Afyare and other Defendants drove Jane Doe Two to Nashville, Tennessee for the purpose of causing Jane Doe Two to engage in sex acts. Id. at ¶¶ 45-48. While in Nashville, Defendant Abdullahi Afyare and other Defendants were arrested during a traffic stop by Nashville police officers for contributing to the delinquency of a minor, as Jane Doe Two had been reported as a runaway. Id. at ¶¶ 49-50.

Count Two charges that from January 2000 to July 2010, Defendant Abdullahi Afyare combined, conspired, confederated, and agreed to with other co-defendants to benefit financially from a venture that recruited, enticed, harbored, and transported Jane Doe One, Jane Doe Two, Jane Doe Three, and Jane Doe Four and other minor persons, knowing and in reckless disregard of the fact that they had not attained the age of 14 years and had not attained the age of 18 years, and that means of force or fraud or a combination of such means would be used to cause a person to engage in a commercial sex act.

In Count Three, Defendant Abdullahi Afyare is charged with conspiring to alter, destroy, mutilate and conceal an object. Id. at ¶ 70. As to his specific acts, on or about May 2, 2009, Defendant Abdullahi Afyare spoke to a person inquiring whether anyone had spoken to Jane Doe

4

Two's family. Defendant Abdullahi Afyare was told that the telephone number for Jane Doe Two's family had been provided to Hamdi Afyare and she would speak to the family. Id. at ¶ 77. Count Three makes no other specific allegations against Defendant Abdullahi Afyare.

In Count Four, Defendant Abdullahi Afyare is charged with others in obstructing justice, but that count does not specify any acts by him. Id. at ¶ 82.

Count Twelve charges that from December 1, 2006 through April 28, 2009, Defendant Abdullahi Afyare knowingly recruited, enticed, harbored and transported Jane Doe Two, a minor under the age of 14, to engage in a commercial sex act.

Count Thirteen charges that from December 1, 2006 through April 28, 2009, Defendant Abdullahi Afyare knowingly attempted to recruit, entice, harbor and transport Jane Doe Two, a minor under the age of 14, to engage in a commercial sex act.

In Count Eighteen, Defendant Abdullahi Afyare is charged with conspiring with others to use a counterfeit access device to obtain items valued in excess of $1,000. Id. at ¶ 117. The Defendant Abdullahi Afyare possessed such a device. Id. at ¶ 119. On July 27, 2009, Abdullahi Afyare asked a co-defendant to contact a Minneapolis police detective to convince the detective to drop pending charges against Defendant Abdullahi Afyare so that Defendant Abdullahi Afyare and the co-defendant could continue their "work" together of committing access device fraud. Id. at ¶ 128.

On August 15, 2009, Defendant Abdullahi Afyare and a co-defendant used a counterfeit credit card to purchase goods at a Walgreens and Wal-Mart in Maple Grove, Minnesota. Id. at ¶¶ 130-131. The goods were valued at $333.90 and $1009.91, respectively. Id. On September 27, 2009, Defendant Abdullahi Afyare and a co-defendant used a counterfeit credit card to purchase $668.32 worth of goods at a Wal-Mart in Maple Grove, Minnesota.

5

## B. Proof at the Detention Hearing[2]

At the detention hearing held November 9, 2010 before the Honorable Magistrate Judge Franklin L. Noel, District of Minnesota, the Defendant's sister, Hamdi Afyare,[3] testified. Hamdi Afyare testified that she the oldest of five siblings and the defendant is the youngest. (Docket Entry No. 342-1, Transcript of Removal/Detention Hearing November 9, 2010 at p. 22). Hamdi Afyare stated that on the night of his arrest, the Defendant Abdullahi Afyare lived at the house of his cousin and his brother. Id. Hamdi Afyare stated that two months prior to Defendant Abdullahi Afyare's arrest, she had moved into a new apartment with her sisters, and that the apartment was in Burnsville, Minnesota. Id. According to Hamdi Afyare, Defendant Abdullahi Afyare has no ties outside the Minneapolis area. Id. at p. 23. Hamdi Afyare further stated that Defendant Abdullahi Afyare was enrolled in his first semester at St. Paul College, id. at p. 24, and that for the past year Abdullahi Afyare was either with his family, their grandfather, or his girlfriend. Id. Hamdi Afyare also noted that Defendant Abdullahi Afyare is a permanent resident and does not have a passport. Id. at p. 25.

At the detention hearing November 9, 2010, the Defendant also proffered a letter from his girlfriend, a letter from the Confederation of Somali Community in Minnesota from Adaisis Warsame, a letter from El Collegio, one written "today" and one written about his performance in 2003. Id. at p. 19. Through counsel, Defendant Abdullahi Afyare proffered that he had an

---

[2] A substantial amount of the Government's proof on the detention issue involves other defendants' acts and statements. To be sure, with a conspiracy charge, any act of one conspirator is attributable to another, but on a motion to detain the Court must consider the specific facts involving the individual defendant for whom detention is sought. United States v. Stone, 608 F.3d 939, 946 (6th Cir. 2010) ("the dangerousness inquiry must be an individualized" inquiry with "an individualized determination of bail eligibility").

[3] Defendant's proposed findings of fact references the Defendant's sister's name as Hambi Afyare. The record indicates that "Hambi" or "Hamdi" references the same person, namely, Defendant Abdullahi Afyare's eldest sister. For consistency with prior Court records, the Court refers to Defendant's eldest sister as Hamdi Afyare.

individual report to show he was in school at St. Paul Community College, and "also a course description from a class he is taking." Id.

At the March 24, 2011 hearing on the appeal of the release of the Defendant, the Government called Hamdi Afyare as a witness. At this hearing Hamdi Afyare testified that the Defendant lived with her from 2009 and 2010. (Docket Entry No. 552, Transcript of March 24, 2011 Hearing at p. 7). Hamdi Afyare testified she was aware that the Defendant had not graduated from high school nor that he had not received a diploma because he was two credits short for graduation. She further testified that the Defendant was "going to post secondary right now to get some college credits as well as go back and turn in and take his diploma for the two credits he missed" and that he was attending Temple Community College for the purpose of completing his high school credit. Id. Hamdi Afyare further testified that she knew the Defendant was attending St. Paul Community College because "Because I was there -- when you cannot show your high school diploma what you do is you take an assessment test, and I was there. I took him there the day he took the assessment test. He got the grades they needed. He has one semester to turn in his high school diploma or they are going to stop him from taking further classes. That semester is the semester he was attending right now when he was arrested." Id. at p. 9.

Hamdi Afyare further testified she knew the Defendant attended St. Paul Community College because she drove him there "a couple of times" and the last time she dropped him off was when school was starting. She could not provide any time frame for when she drove the Defendant to St. Paul Community College. Id. at pp. 10-11. Hamdi Afyare testified that she read the Defendant's notes from his religion class the weekend before her appearance in Court. Id. at p. 12.

7

Nimo Afyare, another sister of the Defendant, testified that she always lived together with Hamdi Afyare, and then stated that Hamdi Afyare had a separate apartment.  Id. at p. 18. Nimo Afyare then testified that Hamdi Afyare did not live with her in 2009 and that Hamdi lived in a separate apartment that was close to Nimo's apartment.  Id.  Nimo Afyare testified that she knew her brother attended St. Paul Community College because she helped him do his financial aid and that she had received a letter from St. Paul Community College regarding her brother's failure to attend classes and as a result his financial aid was suspended.  Id. at p. 22.  Nimo Afyare stated she knew the Defendant was actually attending St. Paul Community College as his cousin would borrow her car to take the Defendant to school and the Defendant would discuss how he liked school.  Id. at pp. 23-24.  Nimo Afyare further stated that her cousin and the Defendant would ask to use her car to go to classes approximately two times per week, and that this occurred from the time of enrollment until the Defendant's arrest.  Id. at p. 24.

Thomas Matos, Dean of Student Development and Services at St. Paul College, also testified at the March 24, 2011 hearing.  Matos has held his position for the past 6 years.  Matos testified as to the Defendant's attendance records at St. Paul Community College that were introduced as Government Exhibit 7.  Id. at 30.  Matos testified that the Defendant applied online, and that the information in the application was filled out by the Defendant or someone on his behalf.  Id. at p. 32.  Dean Matos explained that the Defendant was suspended on December 22, 2010 for academic reasons.  Matos explained that the Defendant received a grade of "FN" in all of his classes. This grade means that the student was reported for never having attended class. Id. at pp. 38-39, 51-54, 57, 62-63.  Matos further explained that the Defendant received $5221.64 in financial aid that went to the student.  Id. at p. 41.  The Defendant received this money as a result of a financial aid request and stated therein that he had graduated from Richfield High

8

School in 2009. If the Defendant had not made the statement that he had graduated from high school, he would not have received the financial aid. Id. at pp. 44-46. Matos testified that he had seen similar activity where a student applies to the college, receives the financial aid check, and is never seen again. Id. at p. 57.

The Government also introduced the Defendant's records from Richfield High School. Id. at p. 80-81, Exhibit 36. These records consist of a letter dated March 24, 2011, stating that the Defendant did not graduate from Richfield High School as he did not meet the required credits to earn his diploma.

The Government put on proof regarding an armed carjacking that occurred in Minneapolis, Minnesota on July 27, 2009. Officer Bennet and Detective Carpenter testified that the Defendant and others engaged in the armed carjacking of another person. The officers also testified that the victim did not identify Defendant Abdullahi Afyare as the person who had the weapon. Based upon the inconsistencies of the victim's statements, the Minnesota Police Department and the prosecutor for the state of Minnesota declined to prosecute any individuals as a result of the incident.

The Government also presented a series of transcripts of telephone calls from jail on (Government Exhibits 1-13, 20, and 26-32), that are not authenticated and have gaps, but the Government contends that these calls reflect Defendant's efforts to obstruct various legal proceedings. The callers' names are provided by the Government. The Government contends that this proof establishes that the Defendant, while incarcerated, conspired with co-defendants to have the victim of the carjacking and Jane Doe Two change their statements to law enforcement.

9

Government Exhibit 1 is a telephone call from Haji Osman Salad that discusses posting bond. Defendant Abdullahi Afyare is not mentioned in this conversation nor is he a party to the conversation.

In Government Exhibits 2, 3, 4, and 5, various co-defendants discuss trying to communicate with the girl's family and indicate that the young girl was not talking to them. The co-defendants also discuss the girl's statements that certain co-defendants had sex with her. Defendant Abdullahi Afyare is not mentioned in these conversations nor is he a party to the conversations.[4]

Government Exhibit 6 is a call made on May 1, 2009, from Haji Osman Salad to Liban Sharif Omar. The co-defendants discuss obtaining lawyers and discussions with certain co-defendants. Defendant Abdullahi Afyare is not mentioned in this conversation nor is he a party to the conversation.

In Government Exhibit 7, Haji Osman Salad discusses the charges and getting out of jail with Mohamed Sharif Omar and Liban Sharif Omar. Defendant Abdullahi Afyare is not mentioned in this conversation nor is he a party to the conversation.

Government Exhibit 8 is a transcript of a telephone call made on May 2, 2009, from Haji Osman Salad to Mohamed Sharif Omar and Liban Sharif Omar. During the call, other co-defendants, including Defendant Abdullahi Afyare, participate in the conversation. Defendant Abdullahi Sade Afyare asks his brother if anyone has spoken to the young girl's family. Defendant Abdullahi Afyare's brother states he does not know because he had provided the

---

[4] The Government alleges that Defendant Abdullahi Sade Afyare is referenced as "Junior" in Government Exhibit 4 in a conversation about what "Junior" told investigators, but the transcript is unclear as to whom the co-defendants are referencing. The Court notes that Government Exhibits 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13 and 20 relate only to co-defendants and are not probative of any relevant issue on the detention of Defendant Abdullahi Afyare. The Government also does not offer any analysis as to the relevance of the co-defendants' conversations. Given the Court's citation of Stone's requirement for an individualized assessment of each defendant's acts in other memoranda for co-defendants in this action, the Court is at a loss to understand why the Government submitted these exhibits for Defendant Abdullahi Afyare's detention hearing.

10

number to Hamdi, the Defendant's sister. Hamdi Afyare testified at the hearing on March 24, 2011, regarding this conversation. She denied that she had ever contacted the young lady or her family. On cross-examination, however, the following exchange occurred:

> Q: Ma'am, in relation -- you were asked about contacting Jane Doe 2's family?
>
> A: Yes.
>
> Q: You were asked to do that though, correct?
>
> A: I wasn't asked. I was notified of the situation and how many people were involved, including her. And I have gotten the information of the families of everybody that was involved, including her.
>
> Q: Okay. But you were asked to make contact – you didn't do it, but you were asked to. Is that correct?
>
> A: In my culture, in my community, it's my responsibility. It's not more of an asked, it's more of an assumed position that when something happens, the eldest tends -- or the parent or anybody who's in that household tends to seek out the other families that are involved to learn more information.
>
> Q: And Mohamed Afyare was the one that talked to you about getting the information, getting in contact with Jane Doe 2's family, correct?
>
> A: Mohamed Afyare, my brother, is the one that was able to help me gather who was involved and their information.

(Docket Entry No. 552, Transcript at pp. 93-94).

In Government Exhibits 9, 10, 11, 12, 13 and 20, various co-defendants discuss trying to communicate with the girl's family and state that the young girl was not talking to them. The co-defendants also discuss other issues, such as the car involved and posting bond to be released from jail. Defendant Abdullahi Afyare is not mentioned in these conversations nor is he a party to the conversations.

In Government Exhibit 26, Defendant Abdullahi Afyare attempts to call co-defendant Abdigadir Ahmed Khalif from the Hennepin County Jail. Abdigadir Ahmed Khalif was the victim of the carjacking. Defendant Abdullahi Afyare's call did not connect.

Government Exhibit 27 involves a call by Defendant Abdullahi Afyare from the Hennepin County Jail to a person called "Pete." Defendant Abdullahi Afyare asks Pete to call Abdigadir Ahmed Khalif and tell him not to press charges. Pete agrees to call Abdigadir Ahmed Khalif. In Government Exhibit 28, Defendant Abdullahi Afyare speaks to an unidentified person and asked for "Homer's" (Abdikarim Osman Ali) phone number.

In Government Exhibit 29, Defendant Abdullahi Afyare speaks to Abdigadir Ahmed Khalif and asks him to drop the charges. The two co-defendants have the following exchange:

> AWAALE: They have you on robbery. I talked to your brother, tell your brother they need to bring back Awaale's stuff. Whatever they took from my home –
>
> ABDULLAHI: (inaudible, speaking continuously in the background.) –
>
> AWALLE: – And whatever has been taken from my car, bring it back, Abdullahi, we have nothing against you.
>
> ABDULLAHI: I swear on my mom body, I hope if I don't do this she will be born in hell. Just wait until I come out.
>
> AWAALE: Your brother said whatever, your –
>
> ABDULLAHI: (Inaudible, speaking continuously in the background).
>
> AWAALE: – whatever your stuff that at home he would bring it back to me. I want everything your robbed from me, everything they took from me.
>
> ABDULLAHI: On my mom's grave, I will bring it back to you, Awaale.
>
> AWAALE: Abdullahi, last night they hit me with a gun on my head; okay?
>
> ABDULLAHI: Listen to me bro, listen to me.
> (Inaudible).

AWAALE: That guy is looking up to five years. I didn't even wanted the police to be involved.

ABDULLAHI: (Inaudible, speaking continuously in the background.)

AWAALE: I just need my stuff to be brought back.
(Inaudible).

ABDULLAHI: But listen to me please, if I stay here until 5 o'clock, and they understand what is going on they gonna take me back to Tennessee, my nigger.

AWAALE: Okay, what do you want me to do for you? Where is my stuff?

ABDULLAHI: Talk to the detective and I will bring everything back to you. I swear on my mom's grave.

AWAALE: Okay, tell your brother he needs to bring everything back, and I will get you out of jail.

ABDULLAHI: (Inaudible, speaking continuously in the background.)

AWAALE: Right now the detectives and the crime team are coming to my home to check because they going to check my home because these guys are arrested for other stuff, other problems.

ABDULLAHI: You mean the phones and stuff?

AWAALE: Yes, yes. Look, look, I just want my stuff back, Abdullahi, I have nothing against you. Your are not in there; is that clear, my nigger.
ABDULLAHI: Call the detective and talk to him. I can not be here until 5 o'clock. They going to take me to Tennessee.

AWAALE: I will get you out of there, but I need my stuff. Within one hour I will release you.  There is something you could do, bring my stuff back, Abdullahi.

ABDULLAHI: I will bring it back.

Defendant Abdullahi Afyare tells Khalif, "Man, my nigger, it was not me, man.  Haji was behind all of this, nobody else my nigger."

In Government Exhibit 30, Defendant Abdullahi Afyare speaks to a person identified as "DK."  DK tells Defendant Abdullahi Afyare that Mohamed was to talk to the "guy."  Defendant Abdullahi Afyare tells DK not to give the "guy" his "stuff" back until Defendant Abdullahi

Afyare was out of jail. During this conversation Defendant Abdullahi Afyare also spoke to a person identified as Loso. During the conversation, Loso tells Defendant Abdullahi Afyare to speak to Haji Osman Salad. Salad states that Defendant Abdullahi Afyare needs to be "cool" and that he was "just going to get everything, all of his stuff back to him." Salad also tells Defendant Abdullahi Afyare that Khalif would talk to the detective and after doing so Defendant Abdullahi Afyare would be released.

Government Exhibit 31 is a call in which Defendant Abdullahi Afyare asks if Khalif spoke to the detective, and Khalif confirms that he has done so. Khalif states that Defendant Abdullahi Afyare should be released the next day. A third party then enters the conversation and speaks to Defendant Abdullahi Afyare about what his "story" should be to the detective.

In Government Exhibit 32, Defendant Abdullahi Afyare speaks to an unidentified person and tells the person that Defendant Abdullahi Afyare had spoken to the detective because his fingerprints were in the car. Defendant Abdullahi Afyare confirms that Khalif received his "stuff" back.

The Government did not present any additional proof as to the sex trafficking crimes alleged in the Superseding Indictment.

### B. Conclusions of Law

The relevant portions of 18 U.S.C. § 3142 in deciding the Government's motion to detain this Defendant provide are as follows:

(a) In general.--Upon the appearance before a judicial officer of a person charged with an offense, the judicial officer shall issue an order that, pending trial, the person be--

(1) released on personal recognizance or upon execution of an unsecured appearance bond, under subsection (b) of this section;

14

(2) released on a condition or combination of conditions under subsection (c) of this section;

(3) temporarily detained to permit revocation of conditional release, deportation, or exclusion under subsection (d) of this section; or

(4) detained under subsection (e) of this section.

\* \* \*

(e) Detention.--(1) If, after a hearing pursuant to the provisions of subsection (f) of this section, **the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial.**

(2) **In a case described in subsection (f)(1) of this section, a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the safety of any other person and the community if such judicial officer finds that--**

(A) the person has been convicted of a Federal offense that is described in subsection (f)(1) of this section, or of a State or local offense that would have been an offense described in subsection (f)(1) of this section if a circumstance giving rise to Federal jurisdiction had existed;
(B) the offense described in subparagraph (A) was committed while the person was on release pending trial for a Federal, State, or local offense; and

(C) a period of not more than five years has elapsed since the date of conviction, or the release of the person from imprisonment, for the offense described in subparagraph (A), whichever is later.

(3) **Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed–**

\* \* \*

**(E) an offense involving a minor victim under section 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425 of this title.**

15

18 U.S.C. § 3142(e) (emphasis added).

In deciding the detention issue, the Court must consider the following factors:

(g) Factors to be considered.--The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning--

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

> (2) the weight of the evidence against the person;

> (3) the history and characteristics of the person, including--

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

> \*   \*   \*

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g). If the motion to detain is denied, then the Court must set conditions of release,[5] with special conditions for crimes involving a minor.[6]

---

[5] (c) Release on conditions.--(1) If the judicial officer determines that the release described in subsection (b) of this section will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, such judicial officer shall order the pretrial release of the person--

> (A) subject to the condition that the person not commit a Federal, State, or local crime during the period of release and subject to the condition that the person cooperate in the collection of a DNA sample from the person if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 (42 U.S.C. 14135a); and

> (B) subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition that the person--

>> (I) remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court, if the designated person is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community;

>> (ii) maintain employment, or, if unemployed, actively seek employment;

>> (iii) maintain or commence an educational program;

>> (iv) abide by specified restrictions on personal associations, place of abode, or travel;

>> (v) avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense;

>> (vi) report on a regular basis to a designated law enforcement agency, pretrial services agency, or other agency;

>> (vii) comply with a specified curfew;

>> (viii) refrain from possessing a firearm, destructive device, or other dangerous weapon;

>> (ix) refrain from excessive use of alcohol, or any use of a narcotic drug or other controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802), without a prescription by a licensed medical practitioner;

>> (x) undergo available medical, psychological, or psychiatric treatment, including treatment for drug or alcohol dependency, and remain in a specified institution if required for that purpose;

>> (xi) execute an agreement to forfeit upon failing to appear as required, property of a sufficient unencumbered value, including money, as is reasonably necessary to assure the appearance of the person as required, and shall provide the court with proof of ownership and the value of the property along with information regarding existing encumbrances as the judicial office may require;

17

The Government asserts several theories for detention. The first theory is danger to the community based upon the detention statute's statutory presumption of dangerousness for persons charge with criminal acts "involving a minor victim." 18 U.S.C. § 3142(e)(3)(A). This presumption is based upon the indictment that is governed by the probable cause standard, but the statutory standard for detention is clear and convincing evidence. 18 U.S.C. § 3142(e). Congress contemplated that defendants charged with crimes involving minor victims may be granted pretrial release, as reflected in 18 U.S.C. § 3142(c)(1)(B), by requiring electronic monitoring as a condition of release for such a defendant. Detention under this theory requires the Court to examine the specific acts of the Defendant to determine if the Government's proof is clear and convincing that the Defendant's detention pending trial is warranted.

The Government's second theory for detention is the Defendant's post-arrest attempts to obstruct justice by allegedly attempting to persuade the victim and the victim's family not to cooperate with the authorities. The Government also alleges that the Defendant attempted to

---

(xii) execute a bail bond with solvent sureties; who will execute an agreement to forfeit in such amount as is reasonably necessary to assure appearance of the person as required and shall provide the court with information regarding the value of the assets and liabilities of the surety if other than an approved surety and the nature and extent of encumbrances against the surety's property; such surety shall have a net worth which shall have sufficient unencumbered value to pay the amount of the bail bond;

(xiii) return to custody for specified hours following release for employment, schooling, or other limited purposes; and

(xiv) satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community.

18 U.S.C. § 3142(c).

[6] "In any case that involves a minor victim under section 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425 of this title, or a failure to register offense under section 2250 of this title, any release order shall contain, at a minimum, a condition of electronic monitoring and each of the conditions specified at subparagraphs (iv), (v), (vi), (vii), and (viii)." 18 U.S.C. § 3142(c).

obstruct justice post-arrest by working to convince co-defendant Khalif to speak with the

detective and drop the charges for the carjacking. Section 3142(f)(2)(B) requires proof that a

defendant poses "a serious risk" to "obstruct or attempt to obstruct justice or threaten, injure or

intimidate...a witness."[7] Related to both theories, the Government argues that the evidence does

not establish any pretrial release conditions that would protect the public.

As to the dangerousness theory, in <u>United States v. Salerno</u>, 481 U.S. 739 (1987) the

Supreme Court upheld Section 3142 against constitutional challenges because detention involved

a regulatory function of protection of the community, not interim punishment for being charged

with certain offenses:

> **We conclude that the detention imposed by the Act falls on the regulatory side of the dichotomy. The legislative history of the Bail Reform Act clearly indicates that Congress did not formulate the pretrial detention provisions as punishment for dangerous individuals. See S.Rep. No. 98-225, at 8. Congress instead perceived pretrial detention as a potential solution to a pressing societal problem.** <u>Id.</u>, at 4-7.

> The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes.

*   *   *

---

[7] (2) Upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves--

> (A) a serious risk that such person will flee; or

> (B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance. . . . At the hearing, such person has the right to be represented by counsel, and, if financially unable to obtain adequate representation, to have counsel appointed. The person shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise. The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing. **The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence.**

18 U.S.C. § 3142(f)(2).

> We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest.
>
>       \*     \*     \*
>
> We have approved of postarrest regulatory detention of juveniles when they present a continuing danger to the community.
>
>       \*     \*     \*
>
> The government's interest in preventing crime by arrestees is both legitimate and compelling.

Id. at 747, 748, 749 (emphasis added).

The Supreme Court also noted that detention is usually reserved for "extremely serious offenses" where the facts of a given case demonstrate that the Government's interests are "overwhelming."

> The Bail Reform Act, in contrast, narrowly focuses on a particularly acute problem in which the Government interests are overwhelming. The Act operates only on individuals who have been arrested for a specific category of extremely serious offenses. 18 U.S.C. § 3142(f). Congress specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest. . . . **The Government must first of all demonstrate probable cause to believe that the charged crime has been committed by the arrestee, but that is not enough. In a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person. 18 U.S.C. § 3142(f). While the Government's general interest in preventing crime is compelling, even this interest is heightened when the Government musters convincing proof that the arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community. Under these narrow circumstances, society's interest in crime prevention is at its greatest.**
>
>       \*     \*     \*
>
> We think that Congress' careful delineation of the circumstances under which detention will be permitted satisfies this standard. When the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, we believe that, consistent

with the Due Process Clause, a court may disable the arrestee from executing that threat.

Id. at 750, 751, 752 (emphasis added).

In United States v. Stone, 608 F.3d 939 (6th Cir. 2010), the Sixth Circuit set forth the burden shifting evidentiary framework for detention hearings based upon dangerousness:

> Under the Bail Reform Act, 18 U.S.C. § 3142, upheld . . . in Salerno, a defendant may be detained pending trial only if a judicial officer "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A judicial officer's finding of dangerousness must be "supported by clear and convincing evidence." 18 U.S.C. § 3142(f)(2)(b). The default position of the law, therefore, is that a defendant should be released pending trial.
>
> That default is modified, however, for certain, particularly dangerous defendants. Specifically, when a "judicial officer finds that there is probable cause to believe" that a defendant committed one of the crimes listed in section 3142(e)(3), there is a presumption in favor of detention: "Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community[.]" 18 U.S.C. § 3142(e)(3). A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged Hazime, 762 F.2d at 37. Thus, **when the government presents an indictment including charges listed in section 3142(e)(3), it has fulfilled its burden to establish the presumption in favor of detention.**
>
> As our sister circuits have found, section 3142(e)(3)'s presumption in favor of detention imposes only a "burden of production" on the defendant, and the government retains the "burden of persuasion." See, e.g., United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001); United States v. Portes, 786 F.2d 758, 764 (7th Cir. 1985). **A defendant satisfies his burden of production when he "com[es] forward with evidence that he does not pose a danger to the community or a risk of flight."** Mercedes, 254 F.3d at 436. **Although a defendant's burden of production "is not heavy," he must introduce at least some evidence.** United States v. Stricklin, 932 F.2d 1353, 1355 (10th Cir. 1991); see also United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991) ("[A] defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption.").
>
> **Even when a defendant satisfies his burden of production, however, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court."** Mercedes, 254 F.3d at 436. **The presumption remains as a factor because it is**

**not simply an evidentiary tool designed for the courts. Instead, the
presumption reflects Congress's substantive judgment that particular classes
of offenders should ordinarily be detained prior to trial.** See United States v.
Jessup, 757 F.2d 378, 384 (1st Cir. 1985), abrogated on other grounds by United
States v. O'Brien, 895 F.2d 810 (1st Cir. 1990), ("Congress intended magistrates
and judges, who typically focus only upon the particular cases before them, to
take account of the more general facts that Congress found"); see also United
States v. Dominguez, 783 F.2d 702, 707 (7th Cir. 1986) ("[T]he presumption of
dangerousness ... represents Congressional findings that certain offenders ... are
likely to continue to engage in criminal conduct undeterred either by the pendency
of charges against them or by the imposition of monetary bond or other release
conditions."). To rebut the presumption, therefore, a defendant should "present
all the special features of his case" that take it outside "the congressional
paradigm [.]" Jessup, 757 F.2d at 387.

Id. at 945-46 (emphasis added).

Although Section 3142 permits the admission of hearsay evidence to meet the clear and

convincing standard, the hearsay evidence must be reliable. United States v. Thomas, 2006 WL

140558, at *9 (D. Md. 2006).

[T]he Court must nevertheless ensure that the evidence upon which it relies is
reliable. United States v. Goba, 240 F. Supp. 2d 242, 247 (W.D.N.Y. 2003). . .
United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000) (explaining that
magistrate judges must ensure reliability "by selectively insisting upon the
production of the underlying evidence or evidentiary sources where their accuracy
is in question") (internal citations omitted)); United States v. Acevedo-Ramos,
755 F.2d 203, 206-08 (1st Cir. 1985) (assuming that evidence used for purposes
of detention determinations must be reliable); United States v. Accetturo, 623 F.
Supp. 746, 755 (D.N.J. 1985).

Id.

A detention hearing may be conducted by the parties' proffers in the discretion of the

court. Stone, 608 F.2d at 948, citing with approval United States v. Webb, 238 F.3d 426 (table),

2000 WL 1721060, at *8 (6th Cir. 2000) ("[T]the government may proceed in a detention

hearing by proffer or hearsay."); United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996)

("Every circuit to have considered the matter ... [has] permitted the Government to proceed by

way of proffer."). As to the government's reliance on the Superseding Indictment alone to justify detention, there is not any decision cited for that proposition.

Defendant Abdullahi Afyare contends that the Government lacks proof from any witness who observed criminal behavior by him. The Superseding Indictment alleges two separate conspiracies to engage in the sexual exploitation of minors over a period of years. Defendant Abdullahi Afyare is alleged to have participated in the exploitation of a minor child. Defendant Abdullahi Afyare contends that the limited nature of the specific allegations against him in the Superseding Indictment is for a four day period in April 2009, and the lack of other reliable evidence as to the Defendant's actual attendance of college weigh heavily in favor of release.

In this action, Defendant Abdullahi Afyare is charged with driving with Jane Doe Two and other males as passengers to other locations where the victim engaged in sex and some commercial sex acts. Defendant Abdullahi Afyare also drove with some of his co-defendants and the victim to Nashville. Those charges give rise to a presumption of his dangerousness.

The Court observes that the Government did not present any additional proof beyond the Superseding Indictment as to this Defendant's actual participation in the events of April 2009, nor any corroborating statements from the victim about Defendant's involvement. Albeit in a different factual setting, multiple sexual acts with a minor warrant detention. United States v. Abad, 350 F.3d 793, 796, 798-99 (8th Cir. 2003) (vacating a release order of defendant charged with interstate travel to have sex with a minor). Here, however, the Superseding Indictment alleges only one sexual act by this particular Defendant with a minor.

Assuming the correct identification of the individuals on the jail transcripts, Defendant Abdullahi Afyare contends that he appears infrequently in the Government's transcripts, and the

Government did not identify any evidence of an actual attempt by him to speak or communicate with the minor victim or members of the victim's family.

The Government's proof includes this Defendant's armed carjacking in 2009 in which the victim was forced out of his vehicle, but the evidence is that Defendant Abdullahi Afyare did not carry the weapon or play the most active role in this carjacking. Although the victim of that carjacking recanted, in part, the victim restated that this Defendant was involved, but was not armed during this carjacking.

As to the Government's obstruction theory, in this Circuit, a defendant's contact with a witness in the case is not grounds for detention despite the defendant's past history of contacting witnesses to assist in his defense. United States v. LaLonde, 246 F. Supp. 2d 873, 875-76 (S.D. Ohio 2003). There is not a per se rule that an obstruction of justice charge warrants detention. United States v. Demmler, 523 F. Supp. 2d 677, 681, 682, 683 (S.D. Ohio 2007) ("Finally, the Court will not assume that just because Demmler has been charged with witness tampering and obstruction of justice, he is likely to commit these same offenses again during the course of these proceedings. Indulging such an assumption would be tantamount to creating a per se rule of detention in cases involving witness tampering and obstruction, which this Court has already declined to do."). Given the defense challenges to the preparation of these transcripts and the lack of proof about the methods of identification of voices, the Court declines to base detention on that proof. Additionally, Defendant's contact of the witness in the carjacking case does not relate to the charges at issue here.

As to Defendant Abdullahi Afyare's proof and proffer, the Court has to balance these statements about his background, education and work with his conduct over a four day period in April 2009. Defendant Abdullahi Afyare contends that the Government's evidence does not

establish his failure to attend classes at St. Paul Community College. Specifically, Defendant Abdullahi Afyare notes that the attendance records at the college are at best unreliable, and the testimony of his sisters establishes his attendance. In any event, at least some evidence was presented that Defendant enrolled at St. Paul Community College, and while Defendant's attendance was poor, that issue is not determinative of the Defendant's detention status.

Defendant Abdullahi Afyare cites his status as a permanent resident, lack of a passport, and strong ties to the community in Minnesota as assuring his future appearances before the Court. The Defendant's family made repeated trips from Minneapolis to Nashville for the purpose of the Defendant's court appearances. The Defendant's two failures to appear were associated with minor traffic violations. The failures to appear were due to Defendant's incarceration in Davidson County, Tennessee and his failure to receive a letter which resulted in an arrest warrant. In both incidents, Defendant later reported to court to resolve the issues. The other criminal matters pertain to juvenile situations which resulted in probation. Defendant Abdullahi Afyare successfully completed all probation periods as a juvenile. Defendant has no prior felony convictions.

Upon review of the evidence presented to the Court, the Court concludes that the Government has not presented clear and convincing evidence that Defendant Abdullahi Afyare poses a continuing danger to the community nor presented cogent evidence that Defendant Abdullahi Afyare poses a risk of obstruction of justice. The Court also concludes that Defendant Abdullahi Afyare has successfully rebutted the presumption of 18 U.S.C. § 3142(e)(3)(A) and therefore, can be released from pretrial detention with the posting of a $10,000 bond by members of his family, wearing an electronic monitoring device and barring any contact with any co-defendant, witness and their family members as well as imposing other standard conditions of

release.  Upon his release, Abdullahi Afyare's conduct will be monitored and any attempt by him to engage in any such conduct as charged will be addressed promptly. Accordingly, the government's motion for detention as to Defendant Abdullahi Afyare should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _13_ day of April, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge